1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT

8                        EASTERN DISTRICT OF CALIFORNIA

9

10   EDMOND PAUL PRICE,                         Case No. 1:20-cv-00131-JLT-EPG (PC)

11                   Plaintiff,

12        v.                                    FINDINGS AND RECOMMENDATIONS,
                                                RECOMMENDING THAT DEFENDANT
13   ALVARADO, et al.,                          MARTINEZ'S MOTION FOR SUMMARY
                                                JUDGMENT BE GRANTED
14                   Defendants.
                                                (ECF No. 94)
15
                                                OBJECTIONS, IF ANY, DUE WITHIN
16                                              THIRTY DAYS

17

18        Plaintiff Edmond Paul Price is a state prisoner proceeding *pro se* and *in forma pauperis* in

19   this civil rights action filed pursuant to 42 U.S.C. § 1983. (ECF Nos. 1, 6). This case proceeds on

20   the claims against: (1) Defendant Alvarado, for excessive force and deliberate indifference to

21   serious medical needs, each in violation of the Eighth Amendment; conspiracy to violate the

22   Eighth Amendment; violation of the First Amendment; and violation of the Fourth Amendment

23   for an unreasonable search; (2) Defendant Caraveo, for excessive force and deliberate

24   indifference to serious medical needs, each in violation of the Eighth Amendment; conspiracy to

25   violate the Eighth Amendment; and violation of the First Amendment; and (3) Defendant

26   Martinez, for failure to protect in violation of the Eighth Amendment and conspiracy to violate

27   the Eighth Amendment. (ECF No. 19, pp. 2-3).

28        Defendant Martinez now moves for summary judgment on the claims against her, arguing

                                              1

that "there is no evidence that Martinez came to an agreement with Defendants Alvarado or Caraveo to violate any of Plaintiff's rights, and there is no evidence that Martinez was subjectively aware of any risk of harm to Plaintiff." (ECF No. 94-1, p. 5). None of the other Defendants have moved for summary judgment on the claims against them.

For the reasons explained below, it is recommended that Defendant Martinez's motion for summary judgment be granted.

## I.     BACKGROUND

### A.     Plaintiff's Complaint

Plaintiff's verified complaint alleges,[1] in relevant part, as follows.[2]

At all relevant times, Plaintiff was housed at Substance Abuse Treatment Facility at Corcoran (SATF), on D Facility in Building 1, cell 247. Plaintiff was assigned as a second watch porter. He had no prior incidents or disciplinary actions.

Plaintiff's complaint describes incidents in September 2019 where Defendant Martinez, a correctional officer, treated him unfairly. For example, on September 11, 2019, she refused to allow him to return to building 1 after a medical appointment. Although Martinez said there was no building entry by inmates until yard recall, she immediately thereafter let in another inmate. On September 13, 2019, she refused to allow Plaintiff to do "mailouts" where inmates send property out that does not fit in an envelope. On September 18, 2019, she prohibited him from showering, while letting "several Hispanic workers" shower. Plaintiff describes other incidents as well.

On September 21, 2018, at approximately 08:00 hours, Plaintiff was let out of his cell to perform his job duties. Plaintiff did those job duties and then got in line with several co-workers to use one of the kiosks in the dayroom. Plaintiff states that a kiosk can be used to send emails and to download content, such as games, to an inmate tablet. After a couple of minutes, Plaintiff's cellmate brought him a cup of coffee. Martinez immediately called Plaintiff and asked if he was going to do any work that day. Plaintiff informed Martinez that he had finished his job duties and

---

[1] *See Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) ("A verified complaint may be used as an opposing affidavit under Rule 56 . . . [if it is] based on personal knowledge and set forth specific facts admissible in evidence.").

[2] For readability, minor alterations—such as altering capitalization—have been made to some of Plaintiff's quotations without indicating each change.

was waiting in line for the kiosk. Martinez stated that all she saw him doing was standing around and drinking coffee all morning. Plaintiff stated that he had just gotten the coffee, so she was obviously mistaking him for someone else. Martinez stated that she was not mistaken. Plaintiff asked Martinez if he had done something wrong. Martinez asked why Plaintiff felt she was picking on him. Plaintiff explained the earlier incidents described in the complaint and pointed out that all his requests were denied, but "seemed to be granted to Hispanic inmates." Martinez became agitated and responded, "If that's how you feel, I'll take care of it." She directed Plaintiff to clean the shower and stay away from the kiosks. Plaintiff did as instructed.

After Plaintiff had cleaned the shower, all inmate workers were directed to report to the building office. Once all inmate workers had arrived, correctional officers Alvarado and Caraveo,[3] who are Defendants in this case, told the workers they were having problems with Plaintiff and so, from that point on, the inmate workers would not be able to use the phones or kiosks during work hours.

Plaintiff apologized to his co-workers and explained that the officers were mad at him. Plaintiff asked Alvarado and Caraveo not to punish the other inmates just because they were mad at him. Alvarado stated that the punishment would ensue because she did not like when her or her fellow officers were accused of racism.

A few minutes later, Plaintiff heard inmate Martinez (aka Piper) and inmate Trujillio (aka Psycho) talking to Caraveo in the building's breezeway. Plaintiff heard Piper state to Caraveo, "We will fuck that fool off, just don't take the phones from us because of his stupid ass." Caraveo replied, "We will see, let me talk to my partner."

Later, Plaintiff asked Piper if there was going to be an issue. Piper said no but that Plaintiff messed up. Plaintiff asked what that meant, but Piper walked away. Shortly thereafter, Plaintiff noticed a group of inmates talking among themselves. The group consisted of Piper, Psycho, Calkins (aka Rich), and Bravo (aka Grande). Plaintiff had a bad feeling about the situation, so he grabbed a broom and mimicked sweeping to protect himself if attacked.

Officer Alvarado came out of the office and handed Plaintiff a dustpan and directed

---

[3] Defendant Caraveo is spelled multiple ways in various documents, including Plaintiff's complaint. For consistency, the Court uses the spelling "Caraveo" in these findings and recommendations, including when quoting documents other than Plaintiff's complaint.

1  Plaintiff to take it to the mop closet. Plaintiff stated that this dustpan was kept in the podium, not
2  the mop closet. Alvarado asked if Plaintiff was refusing a direct order. Plaintiff said he was not
3  and started to take the dustpan to the mop closet. Alvarado stopped Plaintiff and directed him to
4  leave the broom.

5         Upon entering the mop closet, Plaintiff heard shuffling feet come toward the closet.
6  Plaintiff turned and was punched in the face by Grande. Two more inmates, Rich and Psycho,
7  joined and all beat Plaintiff. Plaintiff curled into the fetal position until the beating stopped. When
8  Plaintiff started to raise up, he received a kick to the lower left side of his back. This caused
9  excruciating pain. Plaintiff started urinating and could not stop. He believes this was due to
10  internal damage.

11         When Plaintiff was sure that he was alone in the mop closet, he tried to get up. The pain
12  was too great. A couple of minutes later, Plaintiff heard boots coming up the stairs and someone
13  enter the closet. Officer Alvarado said, "Get the fuck up!" Plaintiff was slow in attempting to get
14  up, and Alvarado said that, if he could not get up, she would hit her alarm and inform the
   responding officers that she saw Plaintiff attack the inmates who had assaulted him.

15         Plaintiff made it to his feet. He noticed Officer Caraveo standing behind Alvarado.
16  Caraveo instructed Plaintiff to return to his cell and remain there until instructed to do otherwise.
17  Plaintiff did as instructed.

18         While in his cell, Plaintiff spoke with his cellmate, telling him "that he had just been
19  jumped," and then went to take a shower.

20         While in the shower, Defendant Martinez "directed Plaintiff to return to his cell via the
21  building's P.A. system." Plaintiff finished his shower and returned to his cell. At approximately
22  09:00 hours, Martinez made another announcement that yard program was open but dayroom
23  program would be delayed. After the other inmates were let out to yard, Alvarado and Caraveo
24  went to Plaintiff's cell. They ordered Plaintiff's cellmate to leave.

25         Then Alvarado took a step inside the cell and Caraveo remained just behind her. Alvarado
26  asked whether or not Plaintiff heard when Caraveo ordered Plaintiff to remain in his cell until he
27  was told to leave. Plaintiff responded that he had heard him. Alvarado stated that since Plaintiff
28  could not follow simple instructions, he needed to strip out. Plaintiff told her a female officer

4

should not being doing this. She said she could have one of Plaintiff's buddies do it instead. Plaintiff states that she was clearly referring to the inmates who just assaulted him.

Plaintiff removed his shoes, socks, shorts, and shirt. Alvarado then said, "Completely naked, lose the boxers too." Plaintiff complied and was told to turn around. Plaintiff faced the other direction so his back was facing the officers. Caraveo said that the inmates did a good job. Alvarado then directed Plaintiff to turn around and face her. Plaintiff complied but covered his private parts. Alvarado told him to move his hands out of the way.

Plaintiff asked the officers why they didn't just leave him alone and wasn't it enough that they had just had him assaulted. Alvarado stated that it would be enough when she felt it was enough and when she felt Plaintiff had learned his lesson.

Plaintiff moved his hand and said he had learned his lesson. Alvarado told Plaintiff to shut up and said she would determine when he had learned his lesson. She then made a joke about the size of Plaintiff's genitalia. At one point, Plaintiff said he was not going to just stand around for ridicule by Alvarado and Caraveo.

Alvarado then told Plaintiff to turn around and put his hands behind his back. Alvarado whispered to Caraveo something that sounded like, "Take him down." Caraveo shoved Plaintiff, and Plaintiff hit his left knee on a mounted steel stool. Caraveo yanked one of Plaintiff's wrists behind his back. Caraveo put his knee on Plaintiff's back and wrenched Plaintiff's arms up. Plaintiff's face was on a mattress and he could not call out.

Alvarado then put a metal baton "between his butt cheeks." She asked Caraveo if he thought Plaintiff learned his lesson. Caraveo said that he did not know. Caraveo told Plaintiff not to leave his cell for two weeks and not to file any grievances or go to medical for his injuries. He told Plaintiff he "could be got from anywhere in the prison and that all the officers . . . would have his back so Plaintiff wouldn't make it out of prison alive." He asked if Plaintiff understood. Plaintiff replied "Fine, just get the fuck off of me."

Alvarado said, "This motherfucker just don't get it!' Alvarado pushed the metal baton inside Plaintiff's rectum. Caraveo told Alvarado to stop but continued to hold Plaintiff so that he could not get away. While applying pressure to the baton, Alvarado told Plaintiff not to tell anyone what happened, not to go to medical, and not to file any grievances. Plaintiff agreed and

begged them to stop. Alvarado took the baton out and stated, "We better not hear anything else about this."

Plaintiff did not leave his cell or report the issue. Plaintiff was injured and bleeding.

On September 24, 2019, Alvarado came to Plaintiff's cell, conducted another unclothed body search, and told Plaintiff that if he ever said anything about the prior incident, she would write him up saying he exposed himself to her. This body search was directed by Alvarado, who was accompanied by another correctional officer.

On October 1, 2019, Alvarado conducted another unclothed body search and said Plaintiff could come out now that the marks on the back of his head had healed but that he had to keep his shirt on at all times.

### B.      Defendant's Motion for Summary Judgment

Defendant Martinez's motion for summary judgment argues that she is entitled to summary judgment "because there is no evidence that Martinez came to an agreement with Defendants Alvarado or Caraveo to violate any of Plaintiff's rights, and there is no evidence that Martinez was subjectively aware of any risk of harm to Plaintiff." (ECF No. 94-1, p. 5). More specifically, Martinez argues that there is no evidence that she came to any agreement with anyone regarding the alleged assault by inmates on Plaintiff in the supply closet or the subsequent alleged assault on Plaintiff by Defendants Alvarado or Caraveo.

In support of her motion for summary judgment, Martinez has provided her declaration as well as the declarations of Defendants Alvarado and Caraveo; excerpts of Plaintiff's deposition transcript, and excerpts from her deposition transcript. (ECF Nos. 94-4, 94-5, 94-6, 94-7, 119).

Plaintiff has filed a three-page opposition brief, generally arguing that the surrounding circumstances of the alleged assaults would allow a reasonable jury to infer that Martinez conspired with the other Defendants. (ECF No. 106). Plaintiff attaches no supporting evidence to his opposition; however, he separately filed a statement of undisputed facts and a response to Martinez's statement of undisputed facts. (ECF Nos. 106, 108, 109); *see* Local Rule 260 (listing requirements regarding statements of undisputed facts in support of or in opposition to a motion for summary judgment).

Defendants filed a reply, which repeats their arguments in favor of summary judgment

6

and argues that Plaintiff presents only speculative allegations that are insufficient to raise a genuine issue of fact for trial. (ECF No. 112, p. 2).

## II.      LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial," which is not a light burden, the party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory

allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the Court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). And "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

## III.   DISCUSSION

### A.   Failure to Protect

#### 1.   Legal standards

Plaintiff's failure to protect claims stem from his allegations that Defendant Martinez failed to protect him from the alleged assault by other inmates and the subsequent alleged assault by Defendants Alvarado and Caraveo. (ECF No. 11, pp. 9-10).

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation and quotation marks omitted). Among other things, the Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of . . . inmates." *Id.* (citation omitted). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 834 (citation and quotation marks omitted).

> This responsibility requires prison officials to protect prisoners from injury by other prisoners, *Farmer*, 511 U.S. at 833-834, and from other correctional officers, *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). A prison official can only be held responsible for a failure to intercede if he or she had a realistic opportunity to intercede and elected not to do so. *See Cunningham*, 229 F.3d at 1289.

*Melendez v. Hunt*, No. 1:13-CV-00279-AWI-BAM (PC), 2016 WL 5156469, at *11 (E.D. Cal. Sept. 21, 2016).

To establish a failure to protect claim, a prisoner must establish that prison officials were deliberately indifferent to a sufficiently serious threat to the prisoner's safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "'Deliberate indifference' has both subjective and objective components." *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013). The prisoner must show that "the official [knew] of and disregard[ed] an excessive risk to inmate . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Farmer,* 511 U.S. at 837. "Liability may follow only if a prison official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Labatad,* 714 F.3d at 1160 (quoting *Farmer,* 511 U.S. at 847). "[I]n order to satisfy the objective prong, it is enough for the inmate to demonstrate that he was exposed to a substantial risk of some range of serious harms; the harm he actually suffered need not have been the most likely result among this range of outcomes." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1076 (9th Cir. 2013).

### 2.    Analysis – Alleged inmate attack

The Court begins with the alleged attack on Plaintiff by other inmates. Defendant Martinez argues that Plaintiff has no evidence to show that she was aware that this would happen.

According to Martinez's declaration, at all relevant times, Martinez was a control booth officer, who "was responsible for monitoring and supervising all inmates including during inmate work shifts and recreational time in the dayroom, controlling inmate movement, including unlocking cell and building doors, and responding to any emergencies, including inmate altercations and medical needs." (ECF No. 94-7, pp. 1-2). Martinez could not leave the control booth unless relieved by another officer and floor officers could not enter the control booth. (*Id.* at 2).

Martinez acknowledges that she had a conversation with Plaintiff on September 21, 2019, where she concluded that he was not diligently working, but instead was milling about before walking up to use a kiosk. (*Id.* at 2-3). She notes that, during their conversation, Plaintiff accused her "of giving favorable treatment to Mexican inmates." (*Id.* at 3).

According to Martinez, this interaction led her to have a conversation with Defendants

Alvarado and Caraveo about her "observations that multiple inmates had been taking advantage of using the kiosks by not doing their work duties and simply trying to use the kiosks right away." (*Id.*). Believing this to be a problem and relaying her recent interaction with Plaintiff, she suggested that the officers "stop allowing all inmate workers access to the kiosks before dayroom was open." (*Id.*). They agreed to call a meeting with the inmate workers to explain the change and "[n]othing else was said about Price during talk and [they] did not talk about inmate Price at any point for the rest of the shift." (*Id.*).

Martinez used the P.A. system to direct all the inmate workers to report to the front office. She remained in the control booth, and Alvarado and Caraveo addressed the inmates. At the meeting, Alvarado and Caraveo reminded the inmates of their job duties and told them that they could not use the kiosks any longer during work hours. When "inmates asked if there was a specific reason, . . . Alvarado and Caraveo both said that there was not a specific reason." (*Id.*). However, "Price spoke up on his own accord and told the other inmate that it was his fault, that he had said something, and that I was taking it out on all of the inmates. Alvarado and Caraveo denied that any particular inmate was at fault and ended the meeting." (*Id.*).

Following this meeting, Martinez "had no concerns for Price's safety and did not think he was in any risk of danger or harm." (*Id.*). She states that "[t]he other inmates left to finish their duties and take showers, and did not seem upset or frustrated." (*Id.*). Martinez concludes by stating that Alvarado and Caraveo secured the closet at the end of the shift; she did not see where Price went after the meeting; she did not observe Caraveo speak with anyone about Plaintiff, including the inmates who allegedly assaulted him; she did not see Price go to the supply closet and does not know whether he was actually assaulted there; and she did not learn any information suggesting that Price would be assaulted. (*Id.* at 3-4).

Martinez has also provided the declarations of Defendants Alvarado and Caraveo, who support Martinez's version of events, namely, that none of the Defendants singled Plaintiff out as the cause of the loss of kiosk privileges and that there were no indications that he was in danger from other inmates. (ECF No. 94-4; ECF No. 94-5). Martinez also points to Plaintiff's deposition testimony regarding an alleged apology from Martinez to assert that Plaintiff does not know if she was aware that he would be attacked:

1
2
3
4
5

> Yeah. After all this stuff happened, I am still not sure that she's aware of what happened in the cell. But after all this happened, she said that if she would have known things were going to take place, that she would have made sure that it didn't happen. I think she's talking about whenever I was jumped in the mop closet. But she basically apologized and told me that if she knew that it was going to happen, she would have made sure it didn't. So I can't say for sure what she's aware of and what she's not.

(ECF No. 94-6, p. 8; *see* ECF No. 94-1, p. 18; ECF No. 94-6, pp. 9-11).

6
7
8
9
10
11
12
13
14
15
16

  Plaintiff's opposition generally argues that there is sufficient evidence that Martinez failed to protect him from an inmate attack. He states that it was only after his encounter that Defendants held "a meeting with all the inmate workers to inform them that all their kiosk privileges would be taken because of Plaintiff" and the meeting was intended to "enrage inmates against Plaintiff even if Martinez did not know things would escalate as far as they did." (ECF No. 106, p. 2). In his statement of undisputed facts, he claims that "Martinez even noticed inmate Martinez [the inmate that purportedly attacked Plaintiff] questioning Plaintiff about why the meeting had been called." (ECF No. 108, p. 1). He also claims that "Martinez allowed inmates to hide in a cell and let them out so they could attack [him] or did not pay attention to the light on the control panel indicating the door that the 3 inmates were hiding in was open." (ECF No. 106, pp. 2-3).

17
18
19

  Upon review of the parties' arguments and the evidence submitted, the Court concludes that there is no genuine dispute as to any material fact and Martinez is entitled to judgment as a matter of law.

20
21
22
23
24
25
26

  The Court begins by noting that both parties agree that Plaintiff had a conversation with Martinez, where she accused him of not diligently working and he accused her of favoring "Hispanic inmates," and this conversation led to a meeting with inmate workers where their kiosk privileges were taken away. From there, the stories diverge on one point. In his opposition, Plaintiff alleges that the Defendants called a meeting "to inform [other imates] that all their kiosk privileges would be taken because of Plaintiff," (ECF No. 106, p. 2), while Martinez argues that Defendants Alvarado and Caraveo took steps to avoid singling Plaintiff out by telling workers that there was no specific reason for the change. (ECF No. 94-1, p. 17; ECF No. 94-7, p. 3).

27
28

  Notably, Plaintiff provides no evidence to support his version of events—that the purpose

of the meeting was to inform other inmates that their privileges would be taken away because of him in order to "enrage inmates against [him]." (ECF No. 106, p. 2). Importantly, Plaintiff acknowledged at his own deposition that he was not initially singled out; rather, he was the one to first point out that the change was because of him:

> Alvarado and Caraveo pretty much directed us to stand where -- close enough that we could hear, and then they said that since there was an issue and people don't like to follow instructions, that nobody is allowed to use the kiosk or the phones anymore unless it's their tier time. And so everybody seemed upset about it. And I let everybody know that it was an issue because – that they had because of me. And, you know, I didn't want to be some surprise later on and people beat this off at me. I wanted to let everybody know what was going on ahead of time."

(Plaintiff's Deposition, pp. 95-96); (*see also* Plaintiff's Deposition, p. 98 – "They said because of an incident with an inmate, inmates would no longer be able to use the kiosk or the phone until tier -- unless it's their tier time. And I -- I -- I told the inmates that, yes, they were upset about me, and I explained to them what happened as far as me being in the like for the kiosk.").

The Court acknowledges Plaintiff's allegation that Alvarado thereafter blamed him by stating—"Yeah, I don't like whenever my fellow officers are accused of being racist, so it -- it is because of Mr. Price." (*Id.* at 96) (internal quotation marks omitted). However, even accepting this allegation as true, it is insufficient to defeat summary judgment. Importantly, even if Alvarado affirmed Plaintiff's statement taking credit for the loss of kiosk privileges, it is not reasonable to infer that Martinez intended for Alvarado to make this statement, let alone to incite other inmates to attack Plaintiff. And more importantly, for the reasons explained below, there is insufficient evidence to conclude that Martinez believed that Plaintiff would be attacked and disregarded such a risk.

Plaintiff's other allegations likewise fail to create a genuine dispute of material fact. As for his assertion that Defendant Martinez should have anticipated an attack against him because "[she] even noticed inmate Martinez questioning Plaintiff about why the meeting had been called," Plaintiff misconstrues the relevant portion of Defendant Martinez's deposition at issue:

> Q. Okay. Do you remember if [Inmate] Martinez had any reaction to the kiosk policy at that meeting?
>
> A. Yes, I believe so, yes.
>
> Q. What was his reaction?

12

A. *I think he was one that was questioning why we were having the meeting.*

Q. Do you remember him saying anything else?

A. No.

(ECF No. 119, p. 14) (emphasis added).

Shortly thereafter, Martinez testified that she did not have any concern that other workers might retaliate against Plaintiff because "[i]t didn't appear that any of them were upset or irritated or frustrated." (*Id.* at 15).

Rather than indicate that inmate Martinez might have foreshadowed an attack on Plaintiff by questioning Plaintiff at the meeting, the context of Defendant Martinez's deposition testimony simply indicates that inmate Martinez questioned why the meeting was being held at all. Moreover, Martinez testified that no inmates appeared to be upset, irritated, or frustrated so as to indicate that Plaintiff was in danger.

Lastly, Plaintiff claims that "Martinez allowed inmates to hide in a cell and let them out so they could attack [him] or did not pay attention to the light on the control panel indicating the door that the 3 inmates were hiding in was open." (ECF No. 106, pp. 2-3). Plaintiff fails to provide any developed support for this allegation. Rather, it appears generally grounded in Martinez's testimony that it was her responsibility to monitor inmates and that she has a panel that lights up to indicate when a cell door is open. (ECF No. 94-7, pp. 1-2; ECF No. 119, p. 6). However, such facts do not permit a reasonable inference that Martinez knew about an attack on Plaintiff.

As an initial matter, Plaintiff's assertion that Martinez may have allowed the inmates who attacked him to hide in a nearby cell is speculation. But assuming that the inmates were in a nearby cell waiting for Plaintiff to go to the supply closet and that a light would have alerted Martinez that a cell door was open, Plaintiff offers no developed to show that Martinez was deliberately indifferent to his risk of being attacked, *e.g.*, that she actually saw a light for an open cell door, that should have concluded that such posed a danger to Plaintiff, and that she could have intervened.

Notably, Martinez's declaration states that she could not leave the control booth until relieved and, "[f]rom the control booth, [she] was able to observe the front door to the supply

closets in the building, but [she] could not see inside," which is where the purported attack on Plaintiff took place. (ECF No. 94-7, p. 2). Moreover, by Plaintiff's own telling, the attack on him happened shortly after he entered the closet and lasted about thirty seconds to a minute. (ECF No. 1, p. 6). Even assuming that Martinez would have some reason to suspect something was wrong, there is no indication that she could have interceded in time to stop the assault.

Lastly, the Court finds it notable that, while Plaintiff now argues that Martinez knew he faced a risk of attack from fellow inmates, he acknowledged at this deposition that he was unsure whether Martinez was aware or not: "But she basically apologized and told me that if she knew that it was going to happen, she would have made sure it didn't. So I can't say for sure what she's aware of and what she's not." (ECF No. 94-6, p. 8).

In conclusion, even construing the facts in a light most favorable to Plaintiff, there is insufficient evidence for a jury to reasonably conclude that Martinez knew that he may be attacked by other inmates and could have interceded to protect him. Accordingly, Martinez is entitled to summary judgment on this claim.

### 3.      Analysis – Alleged attack by Defendants Alvarado and Caraveo

The Court turns to the alleged attack on Plaintiff by Defendants Alvarado and Caraveo. Defendant Martinez argues that Plaintiff has no evidence to show that she was aware that this attack would happen.

Martinez's arguments on this claim mostly mirror those regarding Plaintiff's claim that she failed to protect him from the alleged inmate assault. In addition to the statements from Martinez's declaration that are summarized above, she contends as follows. From the control booth, Martinez could see the front of cell doors but could not see inside the cells. (ECF No. 94-7, p. 3). And Martinez did not see either Defendant Alvarado or Defendant Caraveo go into Plaintiff's cell on September 21, 2019, and she does not know if his allegations of being assaulted by them are true. (*Id.* at 4). Further, she notes that Plaintiff testified that his door was held open by a bottle cap, which Alvarado knocked out of the way when leaving after the purported assault, which shows that she would not have had to open the door for Defendants to enter the cell. (ECF No. 94-1, p. 18; ECF No. 94-3, p. 6; ECF No. 94-6, pp. 27-30).

Plaintiff opposition generally argues that there is sufficient evidence that Martinez failed

to protect him from an attack by Defendants Alvarado and Caraveo for the reasons discussed above in connection with the inmate attack.

Upon review of the parties' arguments and the evidence submitted, the Court concludes that there is no genuine dispute as to any material fact and Martinez is entitled to judgment as a matter of law.

As discussed above, there is insufficient evidence to indicate that Martinez knew that Plaintiff may be attacked by other inmates and then disregarded that risk. The same holds true, to an even greater degree, for the alleged attack on Plaintiff by Defendants Alvarado and Caraveo. Notably, Plaintiff has offered no argument, let alone evidence, to show that Martinez would have known about the upcoming attack, *e.g.*, overhearing some statement that they planned to attack Plaintiff for accusing Martinez of being racist. Moreover, Plaintiff does not dispute that his door was propped open with a bottle cap, which Alvarado knocked away as she left following the alleged result, which indicates that Martinez did not unlock the door for them. (ECF No. 109, 0. 3). Moreover, he agrees that she would not have been able to see into his cell to observe the assault happening so as to intercede to protect him. (ECF No. 108, p. 2).

In conclusion, even construing the facts in a light most favorable to Plaintiff, there is insufficient evidence for a jury to reasonably conclude that Martinez knew that he may be attacked by Defendants Alvarado and Caraveo and could have interceded to protect him. Accordingly, Martinez is entitled to summary judgment on this claim.

**B.     Conspiracy**

**1.     Legal standards**

Plaintiff's conspiracy claim stems from his allegations that Defendants Martinez, Alvarado, and Caraveo had a meeting of the minds to share the objective of having Plaintiff attacked by other inmates and Alvarado and Caraveo. (ECF No. 11, pp. 9-10).

To state a claim for conspiracy under § 1983, Plaintiff must show the existence of an agreement or meeting of the minds to violate constitutional rights, *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010); *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2001), and that an "actual deprivation of his constitutional rights resulted from the alleged conspiracy," *Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006) (quoting *Woodrum v. Woodward County, Oklahoma*, 866 F.2d

1121, 1126 (9th Cir. 1989)). "'To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.'" *Franklin*, 312 F.3d at 441 (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir.1989)). Additionally, Plaintiff must present evidence that Defendants "conspired or acted jointly in concert and that some overt act [was] done in furtherance of the conspiracy." *Sykes v. State of California*, 497 F.2d 197, 200 (9th Cir. 1974).

### 2.    Analysis

Defendant Martinez argues that Plaintiff has "no evidence to support the claim that Martinez came to an agreement or meeting of the minds with Defendants Alvarado and Caraveo to violate any of Plaintiff's rights." (ECF No. 94-1, p. 12).

Because Plaintiff's conspiracy claim is premised on the alleged assaults on Plaintiff by other prisoners and Defendants Alvarado and Caraveo, Martinez's arguments are largely the same as her prior arguments. In addition to the statements from Martinez's declaration that are summarized above in connection with Plaintiff's failure to protect claim, she also contends as follows.

At no point did she "discuss or come to any agreement about having inmates assault Price, Caraveo or Alvarado assaulting Price, doing anything to Price, or otherwise violating any of Price's constitutional rights with Alvarado or Caraveo." (ECF No. 94-7, p. 4). Rather, she asserts that "the opposite is true" because the Defendants "agreed to address the inmate workers as a group and stop allowing access to the kiosks for all inmate workers to avoid singling Price out." (*Id.*). She asserts that the only agreement she had "with Alvarado and Caraveo was to stop allowing inmate workers to access the kiosks during their work hours and to call a meeting to inform the inmate workers of the change." (*Id.*).

Plaintiff opposition generally argues that there is sufficient evidence that Martinez entered a conspiracy with the other Defendants. (ECF No. 106). He contends that a conspiracy can be inferred because it was only after his "infraction" that the Defendants called a meeting despite other inmates previously committing the same infractions. (*Id.* at 1).

Upon review of the parties' arguments and the evidence submitted, the Court concludes that there is no genuine dispute as to any material fact and Martinez is entitled to judgment as a

16

matter of law.

As an initial matter, the Court reiterates its discussion from above that there is insufficient evidence to indicate that Martinez knew that Plaintiff may be attacked by other inmates, or Defendants Alvarado and Caraveo, and then disregarded that risk. And it concludes that there is even less evidence of a conspiracy that Martinez participated in.

Importantly, the record is devoid of evidence to indicate that Martinez had a meeting of the minds with Defendants Alvarado or Caraveo that Plaintiff be attacked by other inmates or Defendants Alvarado or Caraveo. While Plaintiff argues that the circumstances surrounding the meeting can give rise to an inference that Defendants conspired together, the Court concludes that such inference would not be reasonable.

True, Plaintiff points out that other inmates had previously not been diligent in their work duties without there being a meeting called and privileges being taken away. But Defendants' declarations addressed this point. Notably, they acknowledged that they had observed multiple inmates previously taking advantage of the kiosk privileges by not working diligently and simply trying to use the kiosks right away. (ECF Nos. 94-4, p. 2; 94-5, p. 2; 94-7, p. 3). However, Plaintiff's alleged lack of diligence and subsequent conversation with Martinez was simply the catalyst that led Defendants to decide to call a meeting to address this collective problem. (ECF No. 94-7, p. 3). The simple fact that Plaintiff's conduct led to this meeting is not enough to find that Defendant Martinez conspired to have him assaulted by inmates or Defendants Alvarado and Caraveo.[4]

In conclusion, even construing the facts in a light most favorable to Plaintiff, there is insufficient evidence for a jury to reasonably conclude that Martinez came to an agreement with the other Defendants for Plaintiff to be assaulted, either by other inmates or Alvarado and Caraveo. Accordingly, Martinez is entitled to summary judgment on this claim.

IV.    **CONCLUSION AND RECOMMENDATIONS**

Based on the foregoing, IT IS RECOMMENDED that:

---

[4] To the extent that Plaintiff intends to repeat any of his arguments regarding his failure to protect claims—*i.e.*, that Alvarado allegedly acknowledged at the meeting that Plaintiff was to blame for the loss of kiosk privileges—the Court concludes that there is no evidence to show that Martinez came to an agreement to place the blame on Plaintiff or that she shared the goal of having Plaintiff assaulted.

1.  Defendant Martinez's motion for summary judgment (ECF No. 94) be granted.

2.  Plaintiff's failure to protect and conspiracy claims against Defendant Martinez be dismissed with prejudice.

3.  This case proceeds on the claims against: (1) Defendant Alvarado, for excessive force and deliberate indifference to serious medical needs, each in violation of the Eighth Amendment; conspiracy to violate the Eighth Amendment; violation of the First Amendment; and violation of the Fourth Amendment for an unreasonable search; and (2) Defendant Caraveo, for excessive force and deliberate indifference to serious medical needs, each in violation of the Eighth Amendment; conspiracy to violate the Eighth Amendment; and violation of the First Amendment.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within thirty (30) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 20, 2024**                    /s/ _Erica P. Grosjean_
                                                         UNITED STATES MAGISTRATE JUDGE

18